# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
January 8, 2015 Session

## STATE OF TENNESSEE v. DOMINIC ERIC FRAUSTO

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Union County**
**No. 3640      E. Shayne Sexton, Judge**

_____

**No. E2011-02574-SC-R11-CD - Filed April 1, 2015**

_____

The dispositive issues in this appeal are: (1) whether the defendant's extrajudicial statement was sufficiently corroborated for purposes of the corpus delicti rule to support his conviction of aggravated sexual battery; and (2) whether deviations from the jury selection procedures prescribed in Tennessee Rule of Criminal Procedure 24 are subject to harmless error review or require automatic reversal without a showing of prejudice.  First, we hold that the corpus delicti rule does not apply because the defendant testified at trial and adopted his extrajudicial statement, although he denied one portion of it on cross-examination.  Even assuming the corpus delicti rule applies, the trustworthiness of the defendant's extrajudicial statement was sufficiently corroborated by his own testimony and by that of the prosecution witnesses.  Second, we hold that deviations from prescribed jury selection procedures are non-constitutional errors subject to harmless error analysis.  Such errors require reversal only if a defendant establishes either that the error "more probably than not affected the judgment or would result in prejudice to the judicial process."  Tenn. R. App. P. 36(b).  We conclude that the substantial deviations from Rule 24 during the selection of a jury for the defendant's trial resulted in prejudice to the judicial process, which entitles the defendant to a new trial.  Accordingly, the judgment of the Court of Criminal Appeals is reversed; the defendant's conviction is vacated; and this matter is remanded to the trial court for a new trial, consistent with this decision.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed in Part and Reversed in Part; Conviction Vacated; Case Remanded for a New Trial**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and GARY R. WADE, JEFFREY S. BIVINS, and HOLLY KIRBY, JJ., joined.

Robert L. Jolley, Jr. and Megan A. Swain (on appeal), Knoxville, Tennessee, and Dale Potter, Assistant District Public Defender (at trial), Jacksboro, Tennessee, for the appellant, Dominic Eric Frausto.

Herbert H. Slatery, III, Attorney General and Reporter; Joseph F. Whalen, Acting Solicitor General; Leslie E. Price; Senior Counsel Criminal Justice Division; Jared Ralph Effler, District Attorney General; and Tracy Tipton Jenkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

#### *A. Jury Selection*

Dominic Eric Frausto, the defendant, was indicted by a Union County Grand Jury for two counts of rape of a child and two counts of aggravated sexual battery. The case proceeded to trial in the Criminal Court for Union County, with jury selection beginning on August 26, 2009. The record before this Court regarding jury selection is sparse, and defense counsel indicated at oral argument that not all bench conferences between the attorneys and the trial court were transcribed. Nevertheless, the record sufficiently reflects that the trial court initially seated a panel of eighteen prospective jurors for voir dire and then immediately excused one person for cause. Next, the attorneys addressed the jurors, advised them of the nature of the case, and asked some preliminary questions. Afterwards, the trial court advised each side of its right to exercise nine peremptory challenges and stated that the trial would begin when the trial court had thirteen jurors.

Defense counsel objected to the trial court's jury selection process, noting that he had "never been in a situation where [he had] to strike everybody at one time." The trial court responded that he did not have to strike everybody. Defense counsel stated, "[T]he problem is if I use all of my challenges or if I challenge some more depending on who comes up in the box, then I . . . don't know who is coming up." The trial court responded, "[T]he process is get rid of the ones you don't want. Who might be coming up is completely out of your control . . . ." Defense counsel noted that in his previous experience[1] he had "never had to do more than one strike at a time."

_____

[1] During jury selection, defense counsel stated that he had previously served in another area of Tennessee as a prosecutor and public defender and, since returning to the private practice of law, had represented criminal defendants in at least one other Tennessee county.

Defense counsel exercised seven peremptory challenges on the first panel of eighteen prospective jurors. The trial court instructed the eleven remaining jurors to wait in the jury room while another panel of eighteen prospective jurors were seated and questioned. From the second panel of eighteen, the trial court excused one person for cause and also reminded both parties that they could "back strike" any of the eleven prospective jurors from the first panel then waiting in the jury room.

Following voir dire of the second panel, the defendant used his remaining two peremptory challenges, and the State used three of its challenges. Considering both panels, a total of twenty-three prospective jurors remained. The trial judge then announced that he planned to select randomly ten of the remaining prospective jurors and exclude them from service.

Hearing this, defense counsel again objected to the trial court's method of selecting the jury. The trial court responded that the method "ha[d] been accepted statewide." Defense counsel argued that the method did not allow the parties to determine the twelve or thirteen jurors who would actually decide the case, explaining:

> [B]ased on the first round, we're actually voir diring [eighteen], and we have to make enough selections to eliminate that down to . . . under [thirteen], otherwise, we don't get to go to another round. And then once we go to the second round, we've then had to use up enough challenges that we only have out of this group a limited number of challenges that's available and then . . . you end up with a larger pool than [twelve] or [thirteen,] at which time the [c]ourt then randomly selects instead of the attorneys making the decision who is gonna be sitting in judgment of the defendant in determining guilt or innocen[ce]. The [c]ourt's procedure is that it gets to select, and we think that's improper.

After excusing the jury, the trial court asked defense counsel to explain how his client would be prejudiced by this method of jury selection. Defense counsel stated:

> The problem I've got is, your Honor, the first [eleven] that's left on the panel are not gonna be the [eleven] people that are gonna be the first [eleven] people in this box, it's gonna be a random selection by the [c]ourt. And if the first [eleven are] gonna be who is here and then the [c]ourt's gonna take the next two people and put with it, that's one thing, but to take and pick [twenty-three] and then the [c]ourt randomly picks out of those [twenty-three], that's not a panel picked by the defendant or by the State, that's a panel picked by the [c]ourt.

The trial judge responded that the parties were not entitled to pick jurors, but rather, were only entitled to exclude jurors, that he had used this method of jury selection "for years," and that the method had been accepted throughout Tennessee. Nevertheless, the trial court advised defense counsel that if he could produce "some law" indicating that the trial court's method was "wrong," the trial court would "go with" defense counsel. Although defense counsel was unable to produce any contrary authority at that time, he preserved the objection for the record. The trial court then proceeded by randomly selecting and excusing ten prospective jurors. The thirteen remaining jurors served as the jury at the defendant's trial.

## B. Trial Proof

The defendant was charged with four offenses: two counts of rape of a child, both alleged to have occurred at the defendant's residence on Gray Road, and two counts of aggravated sexual battery, both alleged to have occurred at the victim's residence on Maynardville Highway.[2] The proof offered at trial demonstrated that Lenora Balogh dated the defendant for approximately six months, from February to July 2008. During this time, her two children, M.B., the victim of the alleged sexual offenses,[3] and A.B., were seven and two years old respectively. Ms. Balogh met the defendant when he lived at her apartment complex on Maynardville Highway. In March 2008, the defendant moved to another residence on Gray Road, which he shared with his mother, aunt, and cousin. For the remainder of her relationship with the defendant—March to July 2008—Ms. Balogh and her children stayed at the Gray Road residence five or six nights a week. The couple and the children all slept in the living room. Ms. Balogh and the defendant slept on a pallet on the floor; M.B. slept on the couch; and A.B. slept on the love seat. Ms. Balogh acknowledged that she and the defendant occasionally had sex in the living room while the children were sleeping, but she maintained that the children always remained asleep. Ms. Balogh admitted, however, that M.B. had walked into the living room on one occasion while she was

---

[2] The first two counts of the indictment were identical and alleged that "on or about January 2008 through July 2008" the defendant "did unlawfully, feloniously, intentionally and knowingly sexually penetrate *M.B.*, a child less than thirteen (13) years of age, in violation of T.C.A. 39-13-522." Counts three and four of the indictment were identically worded as well and charged that, "on or about January 2008 through July 2008," the defendant "did unlawfully, feloniously, intentionally and knowingly engage in unlawful sexual contact with a child less than thirteen (13) years of age, in violation of T.C.A. 39-13-504." In a bill of particulars filed on January 26, 2009, the State further defined the date and location of the offenses. As to counts one and two, the date was defined as "[b]etween the last week of February, 2008 and July 8, 2008; but excluding June 23, 2008 to June 27, 2008," and the location identified was the defendant's residence on Gray Road. As to counts three and four, the date was defined as "[d]uring the last week of June 2008," and the location was identified as the victim's residence on Maynardville Highway.

[3] It is the policy of this Court to identify minors in a way that protects their privacy.

performing oral sex on the defendant. Ms. Balogh denied that M.B. saw anything inappropriate, explaining that the defendant was fully clothed at the time.

Beginning in May 2008, Ms. Balogh attended community college classes twice a week from 5:00 p.m. until 9:30 p.m., and she occasionally left her children alone in the defendant's care at his residence during this time. She also periodically left her children alone with the defendant at her own apartment for shorter periods of time while she went out to pick up food or groceries five miles away. When she left for these errands, Ms. Balogh said the children would be "[p]laying or watching a movie" and the defendant would be "[s]itting there with them." The television was located in the bedroom of Ms. Balogh's apartment. Ms. Balogh testified that M.B. had been "doing fine" when she began her relationship with the defendant, but her demeanor toward the defendant changed "approximately in May," and M.B. "went from loving him to hating him."

Ms. Balogh learned of the sexual assault allegations in July 2008 and reported the matter on either July 8 or 9 to the Union County Sheriff's Department, the Department of Children's Services ("DCS"), and M.B.'s doctor.[4] Ms. Balogh stated unequivocally that M.B. had no further contact with the defendant after the allegations were reported.

M.B., eight years old at the time of trial,[5] testified that the defendant raped her at his residence, on the couch in the living room. M.B. could not remember when the rape occurred or how old she was at the time. However, she recalled that her mother had gone to the store and was not present when the rape happened and that her younger sister, A.B., was present in the living room, lying on the love seat. M.B. testified that the defendant "stuck his penis in [her] vagina," "[m]oved it around," and "[i]t hurted." M.B. testified that she was not wearing pants and that the defendant had moved her panties aside to accomplish the rape. M.B. equivocated on the number of times the defendant had raped her—stating on direct examination that it had happened only once but stating on cross-examination and redirect that it had happened more than once.

Christina Gilpatrick, M.B.'s daycare provider for over two years, testified that on two occasions when the defendant came to pick up M.B. from daycare, M.B. ran and hid in the house, cried, and said that she did not want to go home. Ms. Gilpatrick said these incidents occurred the last week of July and in early August of 2008. The dates Ms. Gilpatrick

---

[4] Ms. Balogh learned of the allegations by questioning M.B. about the defendant's conduct toward her. Ms. Balogh decided to question M.B. after observing the defendant with a sixteen-year-old female, whom he described as his "adopted niece," and talking with the defendant about his relationship with her.

[5] M.B. was born on September 12, 2000, so she was almost nine years old at the time of the August 2009 trial.

identified were after Ms. Balogh reported the rape allegations and stated that Ms. Balogh had no further contact with the defendant. When recalled to testify by the defendant, Ms. Balogh stated that the defendant had gone with her to the daycare to pick up M.B. a couple of times during the summer of 2008 and that M.B. was not happy to see him either time.

Phillip Johnson, a criminal investigator with the Union County Sheriff's Department, testified that he began investigating the allegations against the defendant after the report was filed with DCS in early July 2008. The defendant agreed to come into the station for a non-custodial interview on August 4, 2008.[6] Detective Johnson advised the defendant that he was not under arrest and that he could leave at any time, and the defendant signed a "Non-Custodial Interview" form confirming that he was given that advice. Detective Johnson also advised the defendant of his Miranda[7] rights and provided the defendant with a written "Admonition of Rights" form, which the defendant signed, indicating that he understood his rights and waived them. At the defendant's request, Detective Johnson wrote the defendant's statement as the defendant gave it, and the defendant signed each page. The interview lasted less than forty minutes, after which the defendant was allowed to leave.

The defendant's entire written statement was admitted into evidence at trial, and the portion pertinent to this appeal is set out below.

> I remember one night when I was at [Ms. Balogh's] apartment and [A.B.] and [M.B.] was there at the apartment also. [Ms. Balogh] went to the Shell. [A.B.] was asleep on the bed. [M.B.] was sitting on the bed with me watching a movie. [M.B.] had on clothes, but I don't remember what I had on . . . . This was around 11 p.m., around the last week of June[] 2008.
>
> I didn't have a shirt on. We were laying on the bed when [M.B.] reaches over and puts her hand on my penis on top of my clothes. I said, that is not . . . a good place to put your hand. And she [M.B.] just looked at me and smiled. I ask[ed her] how she would like it if I put my hand on her. [M.B.] just grabbed my hand and put it on her vagina. I think [she] had on shorts. I told her this was not nice and that she needed to stop. I did rub her vagina on the outside of her shorts, and [she] was touching me when this was going on my penis on the outside of my shorts. [T]his only happen[ed] for [five] or [ten] seconds. [T]his was the only time anything like this has occurred.

---

[6] Also present during the interview was Detective Johnson's wife, a deputy United States Marshall, who was not acting in any official capacity and merely observed the interview while waiting for her husband to finish work.

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

In addition to providing a statement, the defendant also allowed Detective Johnson to use a buccal swab to collect a DNA sample from inside his mouth. Detective Johnson provided this buccal swab to the Tennessee Bureau of Investigation ("TBI").

TBI Special Agent Stephanie Dotson, team leader in the toxicology unit for the Violent Crime Response Team, testified and described her involvement with the investigation of the defendant's residence at 205 Gray Road. In December 2008, Agent Dotson photographed the defendant's residence, drew a diagram of the living room, and removed six carpet samples from the residence, which had tested positive for biological fluids through onsite chemical testing and exposure to an alternative light source.

TBI Special Agent Kimberly Bryant, a forensic scientist with the serology and DNA unit, testified that she assisted with the collection of carpet samples.[8] Agent Bryant reported that a sample of the carpet taken from near the couch where the rape was alleged to have occurred tested positive for spermatozoa, which was a DNA match to the buccal swab DNA sample Detective Johnson obtained from the defendant.

Gail Clift, a forensic pediatric sexual assault nurse examiner and pediatric nurse practitioner, testified that she examined M.B. on July 19, 2008, for signs of physical or sexual abuse. Ms. Clift obtained a history from M.B. to aid with her examination, and during this time, M.B. told Ms. Clift that the defendant had touched the outside and the inside of her vagina with his penis and his finger. Although Ms. Clift found no physical injuries, she did not view their absence as inconsistent with the history M.B. provided. Ms. Clift explained that "when a finger or an object similar to a finger or small object is inserted into the vagina, usually there is not an injury that occurs." Additionally, Ms. Clift discovered that M.B. had condyloma, a sexually transmitted disease known also as genital warts.

Following the close of the State's proof, the trial court granted in part the defendant's motion for judgment of acquittal by dismissing the second count of the indictment, which charged rape of a child. The trial court found the evidence insufficient for "any reasonable mind" to "find two separate rape of a child convictions in this case." The trial court declined to grant the defendant a judgment of acquittal as to counts one, three, and four of the indictment, which charged rape of a child and two aggravated sexual battery offenses.

The defense recalled Ms. Balogh to the witness stand to clarify that she had reported the allegations on July 8 or 9, 2008, and that M.B. had no contact with the defendant after the report. The defendant also testified in his own behalf. The defendant denied raping or

_____

[8] Despite taking six carpet samples, Agent Bryant tested only the two samples closest to the couch where M.B. said the rape occurred.

sexually assaulting M.B. He claimed that M.B. did not like him because he regularly disciplined her. He explained:

> Well, I used to spank her, not hard, but I used to spank her. And she had issues like teenage issues that I can't really explain, but . . . she acted like a teenage little child, you know. I mean, she really didn't like her mom. She didn't want her mom to date any men. She just hated men for some odd reason.

According to the defendant, he and Ms. Balogh had sex in his living room, on the floor, on the recliner, and on the sofa. He stated that they had sex in his living room "about every night" and that Ms. Balogh's children were usually asleep in the same room, but that A.B. sometimes awoke.

The defendant confirmed that he had voluntarily given Detective Johnson the statement that had been introduced into evidence and explained that the touching he described in the statement occurred at Ms. Balogh's residence on Maynardville Highway sometime in June 2008, when Ms. Balogh was away from home picking up food. He insisted that the touching between him and M.B. "was just more like a hands on, hands off." He explained, "[S]he put her hand on me and then I put my hand on her . . . ." The defendant claimed that the touching upset him, and he denied being sexually aroused by it.

On cross-examination the defendant denied the portion of his statement indicating that he had rubbed the victim's vagina over her clothing, explaining, "I forgot about the rubbing. I didn't know that was in there." The defendant also denied having any type of "venereal disease," but he acknowledged that he had never been tested for genital warts. The defendant also initially claimed that the incident described in his statement was the only time he had been alone with the children. He denied Ms. Balogh's testimony that the children stayed with him while she attended college courses. Later, however, he admitted that Ms. Balogh left the children at his residence "once or twice," but he claimed that other members of his family were also present on these occasions.

At the close of all the proof, the State made an election of offenses. As for rape of a child charged in count one, the State sought conviction for the defendant unlawfully sexually penetrating M.B.'s vagina with his penis at his Gray Road residence between the last week of February 2008 and July 8, 2008, but excluding June 23, 2008 to June 27, 2008. As to the aggravated sexual battery charged in count three, the State sought conviction for the defendant's touching and rubbing M.B.'s vaginal area at her residence on Maynardville Highway during the last week of June 2008. As to the aggravated sexual battery charged in count four, the State sought conviction for the unlawful sexual contact that occurred "when

-8-

[M.B.] touched the defendant's penis over the top of the defendant's clothes" during the last week of June 2008 at her Maynardville Highway residence. The jury acquitted the defendant of rape of a child but returned a guilty verdict on both counts of aggravated sexual battery. The trial court merged the convictions because they related to a single and brief incident of contemporaneous touching and sentenced the defendant to twelve years confinement.[9]

The defendant appealed, arguing that his conviction should be dismissed, a new trial ordered, or his sentence reduced because: (1) the evidence presented at trial was legally insufficient to sustain his conviction; (2) the trial court failed to comply with Rule 24 of the Tennessee Rules of Criminal Procedure during the jury selection process; and (3) the trial court abused its discretion by imposing the maximum twelve-year sentence.

The State conceded that the trial court erred by deviating from the requirements of Rule 24 concerning the jury selection process but argued that the error neither interfered with the defendant's ability to exercise fully his peremptory challenges nor prejudiced him. The State argued that the defendant's remaining issues were without merit. The Court of Criminal Appeals agreed with the State and affirmed the defendant's conviction and sentence. State v. Frausto, No. E2011–02574–CCA–R3–CD, 2013 WL 6835069, at *1 (Tenn. Crim. App. Dec. 23, 2013). We granted the defendant's application for permission to appeal.

## II. Analysis

In this Court, the defendant raises the same issues he raised in the Court of Criminal Appeals and two additional claims of error: (1) the Court of Criminal Appeals applied the wrong standard of review when reviewing the length of his sentence; and (2) the trial court's jury instruction regarding aggravated sexual battery constitutes plain error.[10] The State, too, advances the same arguments it made to the intermediate appellate court on the issues raised

---

[9] The State agreed with the trial court's decision to merge the convictions and has not raised the merger as error on appeal.

[10] The defendant raised this second issue in a second supplemental brief filed on January 8, 2015, the same day oral argument was presented to this Court. As support for this issue, he relied on a decision of this Court rendered in late 2014. State v. Clark, 452 S.W.3d 268, 299 (Tenn. 2014). The State has not filed a written response to the defendant's second supplemental brief but asserted during oral argument that the defendant has waived the issue raised therein and is not entitled to relief via the plain error doctrine. Because we are remanding for a new trial, we need not address the defendant's challenge to the jury instructions at issue in this appeal, except to emphasize that the jury instructions given at the defendant's new trial shall be consistent with Clark. Id. at 297-99. Our decision to grant a new trial also obviates the need to address the defendant's claim that the intermediate appellate court applied the wrong standard when reviewing the length of his sentence.

below.  As to the two additional issues, the State asserts that the Court of Criminal Appeals applied the correct standard when reviewing the defendant's sentence and that the defendant waived the jury instruction challenge by failing to raise it in the courts below.

### A. Corpus Delicti

#### 1. Standard of Review

The defendant argues that his conviction should be vacated and dismissed because the only evidence of his guilt was his own uncorroborated extrajudicial statement, which is insufficient to support his conviction.  Our role when reviewing a challenge to the sufficiency of the evidence is to "determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  State v. Hawkins, 406 S.W.3d 121, 130 (Tenn. 2013) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also Tenn. R. App. P. 13(e).  In conducting this analysis, "we must afford the State the strongest legitimate view of the evidence and any reasonable inferences that may be drawn from it."  State v. James, 315 S.W.3d 440, 455 (Tenn. 2010).  A guilty verdict replaces the defendant's presumption of innocence with a presumption of guilt.  Hawkins, 406 S.W.3d at 131.  The defendant thus bears the burden of demonstrating insufficiency of the evidence.  State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011).

#### 2. Modified Trustworthiness Standard

The defendant stands convicted of aggravated sexual battery, which, as charged in this case, is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . less than thirteen (13) years of age."  Tenn. Code Ann. § 39-13-504 (a)(4) (2014).  "'Sexual contact' includes the intentional touching of the victim's, the defendant's or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification."  Id. § 39-13-501(6) (2014).[11]

The defendant's challenge to the sufficiency of the convicting evidence is based on the long-established common-law rule that a person cannot be convicted of a crime solely on the basis of an uncorroborated extrajudicial confession.  State v. Bishop, 431 S.W.3d 22, 61 (Tenn. 2014).  To determine whether an extrajudicial confession has been sufficiently

---

[11] The current statutory definitions of aggravated sexual battery and sexual contact are identical to the definitions in effect when the defendant was charged.  Thus, citations are to the current statutes.

corroborated, Tennessee follows the "modified trustworthiness standard." Id. at 59-60. Under this standard:

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

Id. at 60. Crimes that lack a tangible injury may include inchoate crimes, certain financial crimes, status crimes, "and sex offenses lacking physical evidence *and* a victim who can testify." Id. at 59 n. 28 (emphasis added). "Prima facie" evidence is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." Clark, 452 S.W.3d at 280 (quoting Black's Law Dictionary 638-39 (9th ed. 2009)). "Substantial evidence" is "[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." Id. (quoting Black's Law Dictionary 640 (9th ed. 2009)). "A statement made under oath in open court, however, requires no independent corroboration." Bishop, 431 S.W.3d at 61. Moreover, a defendant's testimony in open court can serve as corroboration for an extrajudicial statement. Id.

In the instant case, we need not even apply the modified trustworthiness test set out in Bishop because the defendant testified in open court and under oath that his earlier written statement was accurate and voluntary. Although he later disclaimed the portion of his extrajudicial statement regarding rubbing M.B.'s vagina, it is within the province of jurors to evaluate the defendant's testimony and decide, what, if any, of his proffered testimony they choose to believe.

Moreover, even if the modified trustworthiness test applies, its requirements are satisfied in this case. Because this is a sex offense lacking physical evidence but involving a victim who testified, we apply the standard for tangible injury crimes. Clark, 452 S.W.3d at 280. The defendant acknowledged and confirmed almost all of his extrajudicial statement during his in-court testimony. Specifically, he admitted that on at least one occasion, while Ms. Balogh was away from home and while he and M.B. were watching television alone together in the bedroom of M.B.'s residence, M.B. touched the clothing covering his penis, and he touched the clothing covering M.B.'s vagina. Ms. Balogh's testimony that she occasionally left M.B. alone at her residence with the defendant while she went out to pick

up food or groceries and that he and M.B. usually watched television together in her bedroom on these occasions corroborated certain details of the defendant's statement. Ms. Clift's testimony that M.B. gave a history of the defendant touching her vagina with his finger, in addition to his penis, corroborated the defendant's statement as well. Thus, even if the trustworthiness test applies, the record contains substantial independent evidence tending to show that the defendant's extrajudicial statement is trustworthy. We affirm the judgment of the Court of Criminal Appeals and hold, therefore, that the evidence is sufficient to support the defendant's conviction of aggravated sexual battery.

## B. Deviations from Rule 24 Jury Selection Procedures

The defendant next contends that he is entitled to a new trial because the trial court willfully deviated from the jury selection procedures prescribed by Tennessee Rule of Criminal Procedure 24. The State acknowledges that the trial court did not comply with Rule 24 but argues that the defendant has failed to establish any prejudice resulting from the noncompliance.[12]

### 1. Standard of Review

Trial courts enjoy considerable discretion in jury selection to question jurors regarding their qualifications to serve, to conduct individual or group voir dire, and to determine whether jurors should be excused for cause. Tenn. R. Crim. P. 24(b), (c); State v. Sexton, 368 S.W.3d 371, 390-91 (Tenn. 2012). In reviewing such decisions, this Court typically applies an abuse of discretion standard. Id. at 391. Although this is a deferential standard of appellate review, it "does not . . . immunize a lower court's decision from any meaningful appellate scrutiny." Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010). Even when making discretionary decisions, trial courts "must take the applicable law and the relevant facts into account." Id. A trial court abuses its discretion when it "causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." Gonsewski v. Gonsewski, 350 S.W.3d 99, 105 (Tenn. 2011); Culbertson v. Culbertson, 393 S.W.3d 678, 683 (Tenn. Ct. App. 2012).

### 2. Application of Incorrect Legal Standard

We agree with the parties that the trial court failed to follow the relevant jury selection procedures. Tennessee Rule of Criminal Procedure 24(d) provides:

---

[12] We are not required to accept concessions but agree with the State's concession in this regard. State v. Hester, 324 S.W.3d 1, 69 (Tenn. 2010).

(d) **Exercising Peremptory Challenge.** After the court conducts its initial examination and seats a tentative group of jurors not excluded for cause, the following procedure *shall be followed until a full jury has been selected from those jurors and accepted by counsel:*

(1) At each round of peremptory challenges, counsel shall submit simultaneously to the court either a blank sheet of paper or a sheet of paper challenging one or more jurors in the group of the first twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) jurors who have been seated. Neither party shall make known the fact that the party has not challenged a juror.

(2) Replacement jurors will be seated in the panel of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) in the order of their selection.

(3) If necessary, additional replacement jurors will be examined for cause and, after passed, counsel will again submit simultaneously, and in writing, the name of any juror in the group of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) that counsel elects to challenge peremptorily. Peremptory challenges may be directed to any member of the jury; counsel are not limited to using such challenges against replacement jurors.

(4) Alternate jurors are selected in the same manner, unless the single entity process of Rule 24(f)(2)(A) is used.

(5) The trial judge shall keep a list of those challenged. If the same juror is challenged by both parties, each party is charged with the challenge. The trial judge shall not disclose to any juror the identity of the party challenging the juror.

Tenn. R. Crim. P. 24(d) (emphasis added). The commentary to this procedural rule provides the following additional explanation of how jury selection is to function in practice.

Subdivision (d) permits trial judges to seat more than twelve prospective jurors for purposes of voir dire–possibly but not necessarily a number equal to twelve plus the number of peremptories to each side and the

-13-

number of alternates available.  All of these persons in the jury "universe" could be questioned at once.  Note that if the "separate entities" procedure of Rule 24(f)(2)(B) is used, challenges are initially made to only the first twelve seated.  Note also that under this procedure "replacement jurors will be seated in the panel of twelve in the order of their selection."

For example, a judge might cho[o]se to impanel thirty-two prospects. Each would be assigned a number.  If during the initial round of peremptory challenges jurors number 3 and 6 are excused, juror 13 would replace 3 and juror 14 would replace 6.  *By this method lawyers would know who is coming up next.*

Tenn. R. Crim. P. 24(d) advisory commission cmt. (emphasis added).

Although the current version of Rule 24(d) became effective three years before the defendant's trial,[13] the record on appeal reflects that the trial court was unaware of the procedure mandated by Rule 24(d) and mistakenly asserted that the procedure utilized for the defendant's trial was applied throughout the State.

Like other procedural rules of general applicability, the Tennessee Rules of Criminal Procedure are laws of this State "in full force and effect." Tenn. Dep't. of Human Servs. v. Vaughn, 595 S.W.2d 62, 63 (Tenn. 1980).  "Any other construction would thwart, frustrate and emasculate" the rules, id., which are "designed . . . to ensure a 'just determination of every criminal proceeding,'" id. (quoting Tenn. R. Crim. P. 2); see also State v. Hodges, 815 S.W.2d 151, 155 (Tenn. 1991).  Suggestions and recommendations for changing the rules may be submitted to the Advisory Commission on Rules of Practice and Procedure.  State v. Coleman, 865 S.W.2d 455, 458 (Tenn. 1993).  Moreover, supplementary rules of criminal procedure may be adopted to address issues for which no other procedure is prescribed, so long as such rules are consistent with constitutional principles, statutes, and generally applicable procedural rules.  State v. Reid, 981 S.W.2d 166, 170 (Tenn. 1998); see also Tenn. Code Ann. § 16-3-407 (2009).

But ignoring or rewriting the clear mandates of the Tennessee Rules of Criminal Procedure is not an option available to trial courts.  The trial court applied an incorrect legal standard by failing to comply with the clear mandates of Rule 24(d) during the jury selection of the defendant's trial.  However, this determination does not end our inquiry.  Our next task is to evaluate whether this abuse of discretion caused an "injustice," which entitles the defendant to a new trial.  Gonsewski, 350 S.W.3d at 105.

---

[13] Tenn. R. Crim. P. 24(d) (2006) (showing that the amendment became effective on July 1, 2006).

*3. Effect of Deviation from Rule 24*

The federal and state constitutions guarantee a criminal defendant the right to a fair and impartial jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; see also Sexton, 368 S.W.3d at 390. Rules prescribing jury selection procedures are intended to ensure "the accused a fair and impartial jury chosen from a fair cross-section of the community." Coleman, 865 S.W.2d at 458. Indeed, the overarching goal of voir dire is to ensure that jurors are competent, unbiased, and impartial. State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992). Peremptory challenges are one important means of achieving this goal. State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993) (citing Ross v. Oklahoma, 487 U.S. 81, 88 (1988)). Nevertheless, the right to exercise peremptory challenges "is not of constitutional dimension." Id. at 248 (citing Ross, 487 U.S. at 88); see also Rivera v. Illinois, 556 U.S. 148, 152 (2009) ("This Court has long recognized that peremptory challenges are not of federal constitutional dimension." (internal quotation marks omitted)).

The defendant acknowledges these earlier precedents but nonetheless contends that reversal without a showing of prejudice should be the remedy when a trial court deviates in any way from mandatory jury selection procedures. In support of this argument, the defendant relies on the following language from Swain v. Alabama, 380 U.S. 202, 219 (1965): "The denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice." But the defendant fails to recognize that the United States Supreme Court largely disavowed this language in a unanimous decision rendered just six years ago. See Rivera, 556 U.S. at 160-61. In Rivera, the Court held that deviations from state jury selection procedures which prevent a defendant from exercising a peremptory challenge do not require automatic reversal. Id. The Court explained that automatic reversal is now a rare remedy reserved for errors which render "a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Id. at 160 (quoting Washington v. Recuenco, 548 U.S. 212, 218-19 (2006)). The Court cited two categories of cases involving jury selection for which automatic reversal remains the appropriate remedy. The first category "involves *constitutional errors* concerning the qualification of the jury or the judge," such as the unlawful exclusion of prospective jurors based on race or on their general, conscientious, or religious objections to the death penalty. Id. at 161 & n.2 (emphasis added) (citing Batson v. Kentucky, 476 U.S. 79, 80 (1986); Witherspoon v. Illinois, 391 U.S. 510, 522 (1968)). The second category "involves circumstances in which *federal* judges or tribunals lacked statutory authority to adjudicate the controversy" and the resulting judgments are held "invalid as a matter of *federal* law." Rivera, 556 U.S. at 161 (emphasis added). "Absent a federal constitutional violation," the Court explained, state courts are free to decide either that a trial court's denial of peremptory challenges "is reversible error *per se,*" or "that the improper seating of a competent and unbiased juror . . . could rank as harmless under state law." Id. at 161-62. Not surprisingly,

some state courts have adopted a rule of automatic reversal, see, e.g., Commonwealth v. Hampton, 928 N.E.2d 917, 927 (Mass. 2010); People v. Hecker, 942 N.E.2d 248, 272 (N.Y. 2010), while other state courts condition reversal on a defendant's ability to establish prejudice, see, e.g., People v. Novotny, 320 P.3d 1194, 1202 (Colo. 2014); see also State v. Carr, 331 P.3d 544, 641 (Kan. 2014) (collecting cases).

Tennessee falls into this latter category. "[T]his Court has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Automatic reversal is a remedy reserved for structural constitutional errors, such as "the complete denial of the right to counsel, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, and denial of the right to a trial by jury." Id. (citations omitted). Non-structural constitutional errors are subject to harmless error analysis and will be deemed harmless if the State demonstrates beyond a reasonable doubt that the error did not contribute to the verdict obtained. Id. at 372.

The third category of non-constitutional errors includes deviations from prescribed jury selection procedures. See, e.g., State v. Bondurant, 4 S.W.3d 662, 666 (Tenn. 1999); State v. Lynn, 924 S.W.2d 892, 898 (Tenn. 1996); Coleman, 865 S.W.2d at 458; Howell, 868 S.W.2d at 248 (explaining that denial or impairment of the right to exercise peremptory challenges does not violate federal constitutional rights). For such non-constitutional errors, reversal is not automatic. Rodriguez, 254 S.W.3d at 372. "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error "'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Id. (quoting Tenn. R. App. P. 36(b)).

We applied this standard in Coleman, in which the trial court seated eighteen prospective jurors for voir dire instead of the twelve authorized by the version of Tennessee Rule of Criminal Procedure 24(c) then in effect. Coleman, 856 S.W.3d at 458. During voir dire, the trial court in Coleman also

> allowed both sides to use their maximum number of peremptory challenges and any number of challenges for cause at any time. Whenever [twelve] or more unchallenged jurors were left, the court would eliminate the excess number by excusing the last prospective jurors seated. The remaining [twelve] would become the jury for the trial. The trial judge explained that the procedure was implemented in the interest of expediency.

Id. Despite the deviations from the prescribed procedures, the Coleman Court declined to reverse the defendant's conviction. Id. Declaring that "[p]rejudice will not be presumed,"

the Court emphasized that Mr. Coleman had not shown "that the presiding jury was unfair or partial" or "that he was denied the use of his statutorily mandated number of peremptory challenges or that he was at any time denied the exercise of his right to challenge for cause." Id. The Court reiterated the importance of complying with rules prescribing jury selection procedures, which "safeguard[] the judicial process," "protect[] the administration of justice," and provide "a uniform and ordered method that ensures the accused a fair and impartial jury chosen from a fair cross-section of the community." Id. The Court in Coleman also cautioned "that any future deviation from [Tennessee Rule of Criminal Procedure 24(c)] could constitute prejudice to the entire judicial process and require reversal." Id.[14]

This potential for prejudice to the judicial process became reality three years later, when the empaneling of a special jury venire "in direct contravention and violation of state law" was held to be "prejudicial to the administration of justice." Lynn, 924 S.W.2d at 893-94. In Lynn, the trial court conducted a hearing prior to trial regarding jury tampering and determined that the entire regular venire was tainted. Id. at 894. Without notice to either side, the trial court then directed the clerk to draw new names from which jurors would be selected. Id. The clerk procured the special venire list by opening the jury box in her office and withdrawing names from it, rather than producing the jury box in open court for the judge to open and to direct the drawing of sufficient jurors, as required by statute. Id. at 895. The clerk also failed to publish timely the names of the special venire, as required by another statute. Id. at 896-97. Echoing Coleman, the Lynn Court reiterated that "strict adherence to statutory jury selection procedures is essential to the integrity of the judicial process and the instilling of public confidence in the administration of justice." Id. at 894. Because the trial court in Lynn had "totally disregarded the law" without any reason or extenuating circumstances for doing so, id. at 898, the Court reversed Mr. Lynn's conviction of criminally negligent homicide, "despite the absence of proof of actual prejudice." Id. at 894. The Court distinguished earlier decisions involving only "relatively minor" or "inadvertent" deviations that *were* often "necessitated by circumstances beyond the court's control." Id. The Court also noted that, even before the special venire was selected, Mr. Lynn's trial proceeding "had already been discolored by the trial judge's earlier findings of jury tampering." Id. In such circumstances, the Court viewed compliance with generally applicable jury selection procedures as even more important. Id.

Three years after Lynn, this Court was again tasked with determining whether, in a capital murder case, the failure to comply with statutory procedures for preparing a special

---

[14] We note that four years after Coleman, Rule 24(c) was amended to reject another portion of the Coleman holding not relevant to the issue presented in this appeal. See Tenn. R. Crim. P. 24(c) (2005) (explaining the rejection of Coleman in the 1997 Advisory Commission Comment).

venire resulted in prejudice. Bondurant, 4 S.W.3d at 668. In Bondurant, only sixty prospective jurors arrived for jury duty. Id. at 666. Needing more prospective jurors, one or more deputy clerks drew 125 additional names from the jury box outside the courtroom and the presence of the trial judge and began telephoning the persons whose names were drawn and instructing them to appear for jury service. Id. at 666-67. This Court acknowledged that it had previously declined to reverse convictions for "minor" or "inadvertent" deviations or deviations that were "necessitated by circumstances beyond [a] trial court's control." Id. at 670. Nevertheless, as in Lynn, the Court concluded that the trial court in Bondurant had "substantially, flagrantly, and unnecessarily deviated from the statutory procedures." Id. at 669. The Court explained that the unauthorized procedure "denigrated the integrity of the jury system and resulted in a subjective and disorderly selection process," which compromised randomness, id. at 669, and "satisfied neither justice, nor the appearance of justice." Id. at 670.

As the foregoing discussion illustrates, this Court has required defendants seeking relief based on deviations from prescribed jury selection procedures to establish prejudice by showing either that the deviations more probably than not affected the verdict or that the deviations prejudiced the judicial process. Here, the defendant claims that he has shown both types of prejudice. The State responds that the defendant has not shown prejudice of any sort because the deviations were technical rather than substantial.

We conclude that the defendant has established that the deviations from Rule 24(d) resulted in prejudice to the judicial process. Although defense counsel at trial was a seasoned lawyer with much experience prosecuting and defending those charged with crimes in Tennessee, he expressed confusion and uncertainty when the trial court utilized a procedure not countenanced by Rule 24(d). For example, when the trial court announced that it would "begin the trial with [thirteen] jurors," the record indicates that defense counsel understood this remark to mean that he was required to exercise most of his peremptory challenges in the first round in order to have a second round of peremptory challenges. With this understanding, the defendant exercised seven of his peremptory challenges against the first panel of eighteen. Then, instead of calling additional prospective jurors to replace those who were excused, the trial court sent the eleven remaining prospective jurors to the jury room, brought in another panel of eighteen, and started the voir dire process again. During this second voir dire, the defendant used his last two peremptory challenges, and at the end of this process, twenty-three prospective jurors remained. The trial court then randomly selected ten prospective jurors *to excuse* from service and seated the remaining thirteen to hear the defendant's case. Defense counsel objected repeatedly but was unable to call the trial judge's attention to Rule 24(d), despite the trial judge's invitation for defense counsel to produce "some law" showing that the method was "wrong."

As in <u>Lynn</u> and <u>Bondurant</u>, the deviations were substantial and flagrant, not minor, technical, inadvertent, or motivated by circumstances beyond the trial court's control. The facts of this case admittedly bear some resemblance to <u>Coleman</u>, but the procedure used here even more effectively frustrated the ability of both sides to exercise peremptory challenges intelligently. By failing to seat replacement jurors in the order of their selection, the parties were prevented from knowing which of the remaining prospective jurors would be "coming up next." Tenn. R. Crim. P. 24(d) advisory commission cmt. By commingling all twenty-three prospective jurors from both panels and randomly selecting ten jurors *to excuse* from service, the trial court essentially removed from the parties any ability to exercise peremptory challenges intelligently.

Like the Court in <u>Lynn</u>, we do not question the integrity or good faith of the trial court. Nevertheless, we conclude that the substantial deviations from the procedures prescribed by Rule 24(d) resulted in prejudice to the judicial process. As such, the defendant is entitled to a new trial.

## III. Conclusion

We conclude that the evidence is sufficient to support the defendant's conviction of aggravated sexual battery. Nevertheless, because the deviations from the prescribed jury selection procedures in Tennessee Rule of Criminal Procedure 24(d) prejudiced the judicial process, the defendant's conviction is vacated, and this matter is remanded for a new trial. As a result of the new trial, the defendant's challenge to the standard applied on appeal to review his sentence and to the jury instructions given at trial regarding aggravated sexual battery are pretermitted. The method of jury selection at the new trial shall conform to Rule 24(d), and the jury instructions at the new trial shall conform to this Court's decision in <u>Clark</u>, 452 S.W.3d at 297-99. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue, if necessary.

_____
CORNELIA A. CLARK, JUSTICE