IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 11, 2017 Session

## STATE OF TENNESSEE v. MARTINESS HENDERSON

**Appeal from the Criminal Court for Shelby County**
No. 15-00211        Paula L. Skahan, Judge
_____

### No. W2016-00911-CCA-R3-CD
_____

The Appellant, Martiness Henderson, was convicted in the Shelby County Criminal Court of first degree felony murder and received an automatic life sentence. On appeal, he contends that he is entitled to a new trial because he was denied proper jury selection and that his life sentence violates the United States and Tennessee Constitutions. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court committed reversible error during jury selection. Therefore, the Appellant's conviction is vacated, and the case is remanded to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Vacated, Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Martiness Henderson.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark and Sam Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In January 2015, the Shelby County Grand Jury indicted Brandon Vance, Walter Collins, and the Appellant for the first degree felony murder of Larry Wilkins. The Appellant, who was seventeen years old at the time of the crime, was transferred from juvenile to criminal court and was tried separately from his codefendants.

The Appellant does not contest the sufficiency of the evidence. Nevertheless, we will briefly summarize the evidence presented at trial.

Dionne Lee, the victim's fiancée, testified that in March 2014, she and the victim lived together in the Sycamore Lake Apartments. The victim was trying to sell his black Ford Mustang and had placed an advertisement on Craigslist. On the night of March 9, Lee took a nap in bed, and the victim slept on the couch. At some point, Lee was awakened by five or six gunshots. She noticed that the victim was not on the couch, went outside, and saw people standing around. She asked them what had happened, and they told her that "the guy in the Mustang had shot the guy right there." Lee turned around and saw the victim lying on the ground. The victim's Mustang was gone, but a gold Chevrolet Monte Carlo was present. Lee had never seen the Monte Carlo at the apartments previously. She felt the car, and it was warm.

Officer Michael Huff of the Memphis Police Department (MPD) testified that when he arrived at the scene, the victim was lying on the ground, and a Monte Carlo was "[n]ot very far" from the victim. Officer James Smith arrived and found four spent shell casings.

Corrie O'Bryant testified that on March 9, she was living in the Sycamore Lake Apartments and arrived home just before midnight. She saw three or four men looking under the hood of a Mustang, which she thought was "kind of abnormal for that time of night." O'Bryant parked her car and heard gunshots. She went into her apartment and heard a woman screaming. O'Bryant went back outside and saw the victim lying on the ground where the Mustang had been parked. The Mustang was gone.

Laveeka Allen testified that she lived in Sycamore Lake on March 9 and was doing homework when she heard four or five gunshots. She looked out her apartment window and saw three or four men standing outside. One of the men fell, and two or three men ran. A dark-colored Mustang left the apartment complex.

Sergeant James Sewell of the MPD testified that he obtained a search warrant for the gold Monte Carlo and that a "drive-out" tag issued to Brandon Vance was in the vehicle. Sergeant Sewell also found property belonging to Vance and Walter Collins in the car. A two-way radio or "walky-talky" was in the back seat and was still turned on.

Officer James Johnson of the MPD testified that on March 10, he heard a be-on-the-lookout or "BOLO" for a Ford Mustang used in a homicide. He saw the vehicle traveling ahead of him and later found it abandoned with a door open. A witness told Officer Johnson that he had seen "some guys run eastbound."

- 2 -

Edward Cunningham testified that on March 10, he was working as a technician for Memphis Light, Gas and Water and was tearing down an electrical meter when he heard "the loud roaring of a car" and saw a black Mustang drive by. He then heard "[a] ruckus" and "some footsteps" and saw two young African-American males run by him. The Mustang's doors were open. A police officer arrived, and Cunningham told the officer what he had seen.

Sergeant Kevin Lundy of the MPD testified that the Appellant was identified as a suspect in the shooting and taken into custody. On March 11, Sergeant Lundy spoke with him and advised him of his rights. The Appellant's mother was present, and the Appellant signed a waiver of rights form. At first, the Appellant claimed he did not know anything about the shooting. However, after Sergeant Lundy "confronted" the Appellant with information about the case, the Appellant stated as follows: The Appellant and his two "cousins," Vance and Collins, found a car for sale on Craigslist and made arrangements with the victim to look at the car. The three of them planned "to go look at the car and do a test drive and once they came back they were going to rob the guy and take his car." The Appellant was armed with a pistol and was the only person with a weapon. After they test-drove the Mustang, the Appellant "upped the gun at the dude, panicked and shot him." The Appellant later threw the gun into the river. The Appellant told Sergeant Lundy that they went to the victim's apartment to steal the victim's car but that he did not mean to kill the victim.

Officer Michael Coburn of the MPD testified that he processed the Mustang for fingerprints and obtained prints from the hood, front bumper, two front quarter panels, and driver's door window. The parties stipulated that Vance's fingerprints were on the Mustang's front bumper and that the Appellant's fingerprints were on the outside of the driver's door.

Dr. Marco Ross, the Chief Medical Examiner at West Tennessee Regional Forensic Center, testified as an expert in forensic pathology that the victim sustained six gunshot wounds. The bullets entered the victim's upper right back, middle right back, lower left back, the back of his upper left arm, his right elbow or upper right arm, and the back of his right thigh. Some of the bullets passed through the victim's vital organs, and his cause of death was multiple gunshot wounds. Toxicology tests on the victim were negative for alcohol and drugs. On cross-examination, Dr. Ross acknowledged that none of the bullets entered the front of the victim's body.

The Appellant testified that at the time of the shooting, Brandon Vance was twenty-one years old and Walter Collins was seventeen. Vance and Collins were brothers. The Appellant was friends with them and referred to them as his "cousins," but he was not related to them.

On March 9, 2014, Vance, Collins, and the Appellant planned to steal a car they saw advertised for sale on Craigslist. Vance had a gun they were going to use during the robbery, and Collins texted the victim. The victim said they could come look at the car, so they drove Vance's gold Monte Carlo to the victim's apartment complex. Vance, Collins, and the Appellant test-drove the Mustang, and the victim went with them, which prevented them from just driving off with the vehicle. After the test-drive, Vance, not the Appellant, shot the victim. The Appellant and Vance tried to flee in the Monte Carlo, but it would not start. The Appellant said he was "shocked" about the shooting, that the three of them did not discuss shooting the victim, and that the shooting was not part of the plan.

On cross-examination, the Appellant testified that he knew Vance's gun was loaded when they went to look at the Mustang. He acknowledged that Vance shot the victim at least six times. He also acknowledged that he helped plan the robbery, that they planned to use the gun during the robbery, and that they planned to steal the victim's car. He said, though, that he did not plan to kill the victim. The Appellant acknowledged telling the police that he shot the victim. He said he did not know what happened to the gun after the shooting and that he lied about throwing it into the river.

On redirect examination, the Appellant testified that he lied to the police about shooting the victim because Collins told him to "take the charge." He said that he trusted Vance and Collins with his life and that they told him they were going to take care of him in jail. He acknowledged that he thought he would receive "a juvenile court sentence."

At the conclusion of the Appellant's testimony, the jury convicted him of first degree felony murder committed during the perpetration of robbery. The trial court immediately sentenced him to life in confinement.

## II. Analysis

### A. Voir Dire

The Appellant contends that he is entitled to a new trial because he was denied proper jury selection. Specifically, he contends that the trial court abused its discretion when it abruptly ended voir dire while he had peremptory strikes remaining and that the trial court's deviations from Tennessee Rule of Criminal Procedure 24, the rule for jury selection, were "flagrant, unreasonable, and unnecessary." The State argues that the Appellant is not entitled to relief because he has failed to show that the trial court's deviations changed the outcome of trial or resulted in prejudice to the judicial process. We conclude that the trial court's deviations warrant a new trial.

- 4 -

Jury selection began on March 7, 2016. At the outset, the trial court advised the attorneys that "we'll select 14 [jurors] and then at the end of [trial] we'll just strike two." The prospective jurors entered the courtroom, and the trial court initially seated a panel of twenty in the jury box. The court questioned them and dismissed two for cause. The State and defense counsel then questioned the prospective jurors, and the court dismissed three for cause. Next, the attorneys exercised peremptory challenges, striking five. Each time a prospective juror was removed from the panel, the trial court replaced him or her with another prospective juror. The process was repeated with the trial court and the attorneys questioning the prospective jurors, the trial court dismissing some for cause, and the attorneys exercising peremptory challenges.

After a while, only fifteen prospective jurors remained in the jury box. The trial court dismissed one for cause due to a medical condition and requested "another round of challenges." Prospective juror Mitchell was struck from the panel, leaving thirteen prospective jurors. At that point, the trial court announced that "[w]e're going to stop jury selection" and asked that the attorneys approach the bench. During the bench conference, the court stated, "We're going to go with one alternate. . . . It's almost six o'clock. We're going to get this started tomorrow. They've got to get to their cars. And it may be too late for some anyway, but we're going to stop." After the conference, the court said, "Everyone up here, you are our jurors this week." The trial court then excused the jury for the day.

The next morning, the State advised the trial court as follows:

I think just for technical purposes we need to both, the State and the Defense, need to officially accept this jury. We did not have [an] ending round where there were no challenges. We were all at the bench. Nobody objected but I just think for the record we need to either, one, turn in challenge selection sheets that show no additional challenges or we need to officially accept the jury. The State officially accepts the jury and has no additional challenges they wish to proffer to the Court, but I think the Defense needs to.

The trial court asked defense counsel about his "position on this." Defense counsel answered that "we both had challenges left" and that "we had gone through a round where somebody had been struck and still had jurors left and potential strikes." Defense counsel stated that he was refusing to accept the jury and that "I think that we have a very strong [appellate] issue. And it will be the only [appellate] issue other than sentencing that he has. I don't expect there to be any objections to the evidence in this case."

- 5 -

The State agreed with defense counsel's position that the jury had not been officially accepted. The State explained that it was concerned about the trial court's ending jury selection after defense counsel struck Mr. Mitchell from the panel because "we did not have a point where we turned in challenge sheets that showed nobody was being struck." The State noted that "in the State of Tennessee we are allowed to back strike or strike somebody who we had the opportunity not to strike before in Tennessee." The following colloquy then occurred:

> THE COURT: I mean at some point the Court needs to stop the jury selection process. We only have [13] people up here. So there's one alternate. It's 6 p.m. Three minutes to 6 p.m. People need to get to their vehicles. And I'm sorry but I stopped it at that point. I did not give you an extra opportunity -- if I had time I would have, but I stopped it at that point. And if that's an appealable issue -- I mean it's an appealable issue. I don't think it's a winning appealable issue. And if I'm wrong, then this case will be sent back. I do not see how that takes away from your client's opportunity for a fair and impartial trial.
>
> [Defense counsel]: I'm simply saying that if I agree to the composite, then that's a waiver. I mean just under simple [appellate] rules. If I -- at this point the State is asking us to not raise an objection in a timely manner.
>
> . . . .
>
> I've still got strikes available. And we have not finished, in my opinion, and I differ with Your Honor and I accept that position, we have not finished voir dire.
>
> THE COURT: Okay. Well, I warned both sides we're going to finish this up by six. . . .
>
> The timing, it shouldn't have taken until six o'clock. [Attorneys] talk too much in my opinion in jury selection. There's no reason to talk for two hours in selecting a jury, but that's what happens. And, you know, jurors have to get to their vehicles. So that's the situation. I'm sorry I was part of it in causing that. I do not believe it's creating any situation that would deny your client a fair and impartial trial. So we're ready to go forward. Let's bring the jury in.
>
> . . . .

[THE STATE]:  Your Honor, I guess [a] suggestion for [how] we may proceed because I don't think we're in disagreement [with defense counsel] -- that we haven't finished voir dire.  If we have the jury come out and brought back challenge sheets, we would like to formally end the round.  I believe we're on round six, issue no challenges.  And if [defense counsel] issues no challenges, he's accepted these 13.  If he does issue any challenges, because he has four left, then we're in a position where we may need a new jury pool.  But that's --

THE COURT:  We're not doing that.  I'm not doing that.  And for the record, well, we're going to get Officer Glover in here if we can.

THE CLERK:  Officer Young may know, too.

THE COURT:  Officer Young, are you aware about two jurors having boots put on their vehicles yesterday?

DEPUTY:  Yes.  Last night they came back.

. . . .

THE COURT:  So because we kept the jurors so late last night, they had to go have boots [removed from] their vehicles.  So, again, I'm not apologizing.  That's ridiculous and that will not happen in this court again.  So they came back over here because they needed assistance.

THE CLERK:  They had to pay (indiscernible).

THE COURT:  $100.

THE CLERK:  Well, they were going to have to pay $125 and then since I guess they kind of explained to them about the jury duty, they said if they had $50 each cash, they would take the boot off.

THE COURT:  Absolutely ridiculous jury selection takes that long.  Let's bring the jury in.

Our supreme court has stated that "[t]he ultimate goal of voir dire is to [ensure] that jurors are competent, unbiased, and impartial."  State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994).  Control of voir dire is within the sound discretion of the trial court and

will not be found to be in error unless an appellant shows prejudice. State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010).

Rule 24, Tennessee Rules of Criminal Procedure, sets out the procedure for jury selection. Tennessee Rule of Criminal Procedure 24(d) provides as follows:

> After the court conducts its initial examination and seats a tentative group of jurors not excluded for cause, the following procedure shall be followed until a full jury has been selected from those jurors and accepted by counsel:
>
> (1) At each round of peremptory challenges, counsel shall submit simultaneously to the court either a blank sheet of paper or a sheet of paper challenging one or more jurors in the group of the first twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)[1]) jurors who have been seated. Neither party shall make known the fact that the party has not challenged a juror.
>
> (2) Replacement jurors will be seated in the panel of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) in the order of their selection.
>
> (3) If necessary, additional replacement jurors will be examined for cause and, after passed, counsel will again

[1] We note that Tennessee Rule of Criminal Procedure 24(f)(2)(A), which applies in this case, provides for the "single entity method" of selecting and impaneling alternate jurors. The single entity method eliminates the distinction between regular and alternate jurors and states, "Before the jury retires to consider its verdict, the court shall select by lot the names of the requisite number to reduce the jury to a body of twelve or such other numbers as the law provides." Tenn. R. Crim. P. 24(f)(2)(A). The Advisory Commission Comments to the Rule clarify that "before the jury retires to deliberate the court will randomly deselect the additional jurors, leaving the desired number of jurors, ordinarily twelve. The deselected jurors are then discharged when the remaining jurors retire to deliberate." After the trial court gave its final instructions to the jury in this case, the court asked if anyone was unable to deliberate or if anyone wanted to volunteer not to deliberate. Both the State and defense counsel objected to the trial court's request for a volunteer. The trial court replied, "That's what I usually do." However, the court then stated that it would select the alternate juror randomly. The Rule and comments demonstrate that the trial court is to select the alternate jurors randomly.

submit simultaneously, and in writing, the name of any juror in the group of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) that counsel elects to challenge peremptorily. Peremptory challenges may be directed to any member of the jury; counsel are not limited to using such challenges against replacement jurors.

(4) Alternate jurors are selected in the same manner unless the single entity process of Rule 24(f)(2)(A) is used.

(5) The trial judge shall keep a list of those challenged. If the same juror is challenged by both parties, each party is charged with the challenge. The trial judge shall not disclose to any juror the identity of the party challenging the juror.

(Emphasis added.) We note that given that counsel may direct peremptory challenges to any member of the jury, not just replacement jurors, "'back striking is allowed.'" State v. Zachary Gale Rattler, No. E2015-01570-CCA-R3-CD, 2016 WL 6111645, at *8 (Tenn. Crim. App. at Knoxville, Oct. 19, 2016) (quoting State v. Debiasi Sirnard King and Dewayne King, No. 03C01-9801-CR-00015, 1999 WL 281080, at *3 (Tenn. Crim. App. at Knoxville, Apr. 30, 1999)).

Turning to the instant case, the trial court clearly failed to comply with Rule 24(d). Both the State and defense counsel advised the court that the parties had peremptory strikes remaining and that the trial court needed to give defense counsel an opportunity to exercise those strikes. The trial court refused. Defense counsel also would not accept the jury. In fact, defense counsel specifically advised the court that he was refusing to accept the panel.

Our supreme court has determined that when a trial court abuses its discretion by deviating from the jury selection procedures mandated by Rule 24, the deviations are subject to harmless error review, and the appellant must "establish prejudice by showing either that the deviations more probably than not affected the verdict or that the deviations prejudiced the judicial process." State v. Frausto, 463 S.W.3d 469, 486 (Tenn. 2015). Prejudice to the judicial process occurs when the deviations are "substantial and flagrant, not minor, technical, inadvertent, or motivated by circumstances beyond the trial court's control." Id.

We conclude that the trial court's deviations in this case were substantial and flagrant, not minor, technical, inadvertent, or motivated by circumstances beyond the trial

court's control. Although the trial court stated that it had discretion to end jury selection after defense counsel struck Mr. Mitchell from the jury panel because the jurors "need[ed] to get to their cars," the court's comments also demonstrate that it ended jury selection because it was frustrated by the amount of time the attorneys were spending on voir dire. While we can appreciate the trial court's concern for juror safety and understand the court's frustration, "ignoring or rewriting the clear mandates of the Tennessee Rules of Criminal Procedure is not an option available to trial courts." Id. at 482-83. Also troubling is the fact that even the State warned the trial court that the court was substantially deviating from Rule 24 and that the court should continue voir dire. In sum, the trial court "'totally disregarded the law'" without a sufficient reason for doing so. Id. at 485 (quoting State v. Lynn, 924 S.W.2d 892, 898 (Tenn. 1996)). By failing to give defense counsel the opportunity to back-strike potential jurors, the trial court deprived the defense in a first degree murder case of its ability to exercise peremptory challenges. Accordingly, the trial court's deviations from the procedures prescribed by Rule 24(d) resulted in prejudice to the judicial process, and the Appellant is entitled to a new trial.

## B. Life Sentence

The Appellant contends that his automatic life sentence is unconstitutional because it equates to a sentence of life without parole and, therefore, violates Miller v. Alabama, S. Ct. 2455, 2469 (2012). The State argues that the Appellant's sentence does not violate Miller. We agree that the sentence does not violate Miller.

In Miller, the United States Supreme Court held that a mandatory sentence of life without the possibility of parole for a juvenile offender violates the United States Constitution's Eighth Amendment prohibition against cruel and unusual punishment. Id. at 2464. However, this court has repeatedly rejected the argument that a juvenile's mandatory life sentence, which requires fifty-one years before release, is effectively a sentence of life without the possibility of parole and, therefore, violates Miller. State v. Zachary Everett Davis, No. M2016-01579-CCA-R3-CD, 2017 WL 6329868, at *25 (Tenn. Crim. App. at Nashville, Dec. 11, 2017), perm. app. filed, (Tenn. Feb. 9, 2018); State v. Jonathan Gutierrez, No. M2015-01235-CCA-R3-CD, 2017 WL 2274644, at *15 (Tenn. Crim. App. at Nashville, May 24, 2017), perm. app. denied, (Tenn. Sept. 21, 2017); Martez D. Matthews v. State, No. M2015-02422-CCA-R3-PC, 2016 WL 7395674, at *4 (Tenn. Crim. App. at Nashville, Dec. 21, 2016); Charles Everett Lowe-Kelley v. State, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *8 (Tenn. Crim. App. at Nashville, Feb. 24, 2016), perm. app. denied, (Tenn. June 23, 2016); Cyntoia Denise Brown v. State, No. M2013-00825-CCA-R3-PC, 2014 WL 5780718, at *21 (Tenn. Crim. App. at Nashville, Nov. 6, 2014), perm. app. denied, (Tenn. May 15, 2015). As the concurring opinion in Zachary Everett Davis recently explained, though:

- 10 -

[A]lthough Tennessee's sentencing scheme allows for possible release of a defendant convicted of first degree murder after the service of fifty-one years, it is only in the rare instance, if ever, that a juvenile so sentenced would be released back into society. Even if the judge or jury decides that the features of the juvenile or the circumstances of the homicide require a sentence other than life without parole, the effect of the sentence is still the same. The juvenile has no meaningful opportunity for release whether you name the sentence imprisonment for life or imprisonment for life without the possibility of parole, and the juvenile will likely die in prison. "While the logical next step may be to extend protection to these types of sentences, that is not the precedent which now exists" in this State. [Floyd Lee Perry, Jr., v. State, No. W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *4 (Tenn. Crim. App. Apr. 7, 2014), perm. app. denied, Tenn. Sept. 18, 2014)].

No. M2016-01579-CCA-R3-CD, 2017 WL 6329868 at *26 (Thomas, J., concurring). Despite our concerns about mandatory life sentences for juveniles in Tennessee, we feel bound by the precedent from this court on the subject. See id. The Appellant received a sentence of life with the possibility of parole. Therefore, he is not entitled to relief.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' brief, we conclude that the trial court committed reversible error during jury selection. Therefore, the Appellant's conviction is vacated, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
NORMA MCGEE OGLE, JUDGE