IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs March 28, 2018

## STATE OF TENNESSEE v. MAINOR CELIN AVILEZ CANALES

**Appeal from the Circuit Court for Sevier County**
**No. 19414-II            Walter C Kurtz, Senior Judge**

_____

### No. E2017-01222-CCA-R3-CD
_____

The Defendant, Mainor Celin Avilez Canales, was convicted after a jury trial of aggravated sexual battery and sentenced to serve twelve years in prison. The Defendant appeals, contending that the jury instructions did not adequately specify the mens rea of the offense and that the trial court improperly enhanced the sentence. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

William Lee Wheatley, Sevierville, Tennessee, for the appellant, Mainor Avilez Canales.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Jimmy B. Dunn, District Attorney General; and Ronald C. Newcomb, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Defendant was charged with aggravated rape after he was seen carrying the semi-conscious and beaten victim across the parking lot of a bar. The victim, who was severely intoxicated at the time she was assaulted, could not recall the particulars of the assault. At trial, the Defendant asserted that he did not have intercourse with her and that her injuries were the result of a fall.

The victim and her friend, Ms. Angelica Buckner, met each other for drinks at a bar shortly after 9:00 p.m. on January 31, 2014. The victim testified that the Defendant and his friend approached her and Ms. Buckner at the bar. The Defendant was speaking English, and the victim could generally understand him. She had trouble with "[v]ery few" words that he spoke. The victim testified that the Defendant attempted to dance with her but that she did not want to dance. Instead, the Defendant danced behind her as she was trying to get her friend to dance in the bar area. The victim testified that the Defendant attempted to put his hands on her bare hips under her clothing, and she removed his hands but allowed him to dance with his hands on her hips outside her clothing. The victim stated that she did not hug or kiss the Defendant at any time.

The victim drank five and one-half drinks: she had two mixed drinks with Ms. Buckner when she first arrived, drank a shot that the Defendant's friend bought her, drank two shots which the Defendant had bought for herself and Ms. Buckner, and drank half of Ms. Buckner's mixed drink. She recalled speaking with the bouncer at the bar, who offered to remove the Defendant, and she testified that she told the bouncer that "he wasn't bothering us at the time." The victim went outside to smoke a cigarette on the front patio area of the bar, and the Defendant followed her.

The victim testified that when she went outside to smoke, she and the Defendant were the only two people outside, and the Defendant was touching her and "kept … trying to get me to have sex with him." The victim testified that she grew frustrated and replied, "No, because you're nothing more than a dirty f***ing Mexican." She stated that she assumed the Defendant would leave her alone and she turned to continue smoking her cigarette. She next remembered "spitting out the cherry on my cigarette because it had got knocked into my mouth partially." The victim testified that she had two burns on her lip, and she was "not 100% sure if he actually hit me or hit me with something." The victim recalled begging the Defendant to leave her alone, apologizing, and offering to pay him for the drinks. She next remembered lying on her back with the Defendant above her and could recall nothing further regarding the assault.

The victim acknowledged that in all of her prior statements and in her testimony at the preliminary hearing, she had stated that she remembered nothing between going outside to smoke and waking up in a hospital. The victim explained that she had tried very hard to remember the assault and had spoken with some of the witnesses from the bar to that end. In May or June 2014, she recalled the additional snippets to which she had testified. She still could not recall any further information. She did not inform the prosecution or anyone else about the information she had recalled until the day before trial because she did not think it would be useful until trial. The victim stated that she did not unzip or unbutton her pants, did not pull up her shirt, and did not consent to have

intercourse with the Defendant. She acknowledged having a boyfriend but asserted that she was not fabricating an assault to protect that relationship.

Ms. Buckner agreed that the Defendant and his friend approached the victim and Ms. Buckner "periodically" at the bar. The victim was wearing jeans, a blouse, and flip-flops. Ms. Buckner consumed one beer, one-half of a "gross" mixed drink, and one to two shots. She testified that the Defendant was "handsy" with her and with the victim and that Ms. Buckner repeatedly told him to leave them alone. Ms. Buckner testified that she became frustrated and used "inappropriate language" to make the Defendant leave. Ms. Buckner told the Defendant, "We do not f*** Mexicans." The Defendant replied that he was from Colombia. She acknowledged that she spoke with the bouncer at the bar and that while she did mention that the men would not leave them alone, she did not say she felt uncomfortable. She explained that she believed she had made it clear to the men that they should not bother her anymore. After Ms. Buckner made her comment, the Defendant and his friend left the women alone. The victim went outside to smoke a short time later.

Mr. Jesse Parker was working as a bouncer at the bar and recognized the Defendant, who was a regular customer. Mr. Parker noticed the Defendant speaking with the victim and Ms. Buckner, and Mr. Parker checked on the victim and Ms. Buckner while the Defendant was gone to make sure that they were not uncomfortable with his attention. He testified that he witnessed the victim kiss the Defendant and saw some "pretty strong hugging" between the women and the Defendant.

There were no witnesses to testify regarding exactly how the victim sustained her injuries. However, numerous witnesses who were outside near a back kitchen entrance to the bar saw the Defendant with the injured and incoherent victim shortly after 11:00 p.m.

Mr. Raymond Stupplebeen was outside the kitchen entrance when he saw the Defendant and victim behind the restaurant[1] next door, "circling each other." He testified that it looked like they were dancing but that "something wasn't right. The body language wasn't right." He elaborated that part of what raised a "red flag" was that he did not know where the victim and the Defendant had come from despite the fact that he was smoking his second or third cigarette when he noticed them. He saw the victim fall on her behind, and the Defendant stood over her for a minute and "went down to almost get her," at which point "her arms kind of went up." He pointed out to the others that he felt something was wrong, but no one addressed the matter until a few minutes later, when the Defendant picked up the victim "in a bear hug position with her arms and her

---

[1] Witnesses referred to the business next to the bar as either a Mexican restaurant or a Mexican grocery store.

legs kind of dangling down," her feet limp, and her face hidden. The victim's pants were pulled down slightly, exposing her lower back and upper buttocks.

The Defendant carried the victim in one direction until he saw the people gathered near the kitchen entrance, at which point he changed his direction toward the parking lot. Mr. Stupplebeen approached the Defendant and circled him a few times, trying to see the victim's face. He felt that the Defendant's movements were calculated to hide the victim's face. When the others who were outside shouted for the Defendant to let the victim go, he dropped her to the ground "hard," and Mr. Stupplebeen could see "road burns or beat marks" on her face. The victim was missing a shoe. She was unable to move and was propped against a car by bystanders. Mr. Stupplebeen did not recall the victim reaching for him. He tried to stop the Defendant from leaving and called 911 while following the Defendant, who entered the bar. Because the music was loud in the bar and Mr. Stupplebeen would not have been able to hear the 911 operator, he did not follow the Defendant into the bar, although he requested others to do so.

Mr. Dakota Johnson was employed at the bar and worked as a bar-back. He recognized the Defendant as a prior patron of the bar and saw him at the bar on January 31, 2014. Mr. Johnson was smoking a cigarette behind the bar, and he saw the Defendant and victim behind the air conditioning unit of the restaurant next door. Mr. Johnson stated that "it looked like he had her pinned up against the wall, and she was kind of trying to get away from him." The Defendant then "picked her up over his shoulder and started carrying her through the parking lot and up through the parking lot of the bar where we were all standing at." The victim appeared to be crying. When Mr. Johnson and another man confronted the Defendant, he dropped her on the ground. The Defendant explained the victim's injuries by stating she had fallen, but Mr. Johnson testified he was familiar with injuries from a fall to concrete and "that's not what happened." Mr. Johnson elaborated that the victim's "face was – it was bad. She didn't fall." The Defendant recognized Mr. Johnson and said, "My friend. My friend," with his hands up. Mr. Johnson and others tried to ask the Defendant to stay, but he left. The victim "was clothed," and the Defendant was able to communicate in English with "[a] little bit" of trouble.

Mr. Dylan Owens, the kitchen manager at the bar, also witnessed the Defendant carry the victim across the parking lot. He testified that he had previously seen the victim and the Defendant in a quiet area of the bar, that he saw the victim dancing but not romantically or with the Defendant, and that he did not see the victim hug or kiss the Defendant. He testified that Mr. Stupplebeen was the first to see that something was "awry." Mr. Owens was outside a total of thirty to forty-five minutes and heard a "shuffling" and possible raised voices but could not clearly distinguish the sound. When he saw the victim and the Defendant, she appeared intoxicated and could barely walk.

Mr. Owens stated that it appeared that the victim was not just drunk but "like there was something else." He elaborated that he had seen the victim in the bar shortly before and that because she "didn't seem to be in the same state as she was afterwards," he suspected she may have been drugged. Mr. Owens said that the Defendant "more or less had her body and was just kind[ of] dragging her," and that the victim gave "the impression she was maybe lifeless." At one point, the victim fell, and the Defendant picked her back up. The victim was missing one shoe, her pants were not fastened, and she had debris in her hair and gravel on her arms. He observed that she appeared to be "beaten up," and had sustained red marks, scratches, and bruises. He stated that as the Defendant approached, the victim "reached her arms" toward Mr. Stupplebeen. The Defendant told the people outside the bar that he was looking for the victim's friend or sister, and he went into the bar. Mr. Owens acknowledged having made a previous statement that the victim and the Defendant "looked like a couple."

Ms. Rebecca Kirby worked in the kitchen of the bar and got off of work at around 11:00 p.m. She went into the bar area to have a drink and observed the victim and the Defendant dancing "kind of close" but did not see them hug or kiss. Ms. Kirby went out to the back of the bar, and she later saw the Defendant and victim behind the restaurant next door. She stated that they were facing each other and "looked like they were making out." Ms. Kirby testified that the victim fell three or four times and that she "would hold her arms up, and he would pick her back up." The Defendant began to carry the victim toward the parking lot in an unusual manner. Ms. Kirby described him as holding the victim as though he were "burping a baby," elaborating that "[i]t wasn't quite caveman type, but he had her right there." The victim was "deadweight." Ms. Kirby stated the Defendant was trying to hide the victim's face, and when Mr. Stupplebeen approached, the victim held her arms out to Mr. Stupplebeen and to Ms. Kirby "almost like a 'help me' kind of thing." The Defendant told them that "he didn't do anything." Ms. Kirby observed that the victim's face was "messed up," her clothes were "askew," she had no shoes or jacket, her pants were undone and around her hips, and her shirt was unbuttoned and "a little bit" askew. The victim asked for Ms. Buckner. Ms. Kirby estimated that fifteen to twenty minutes elapsed between the time she went outside and the time police were called.

Ms. Buckner testified that when she went to look for the victim, the victim had been found behind the bar. Her face was swollen, bruised, and cut up, and she was missing a sandal. The victim was "conscious but not aware" and was asking for Ms. Buckner.

Mr. Parker was outside on the patio around the time the victim was discovered, and he saw the Defendant come from behind the building. Mr. Parker testified that as the Defendant passed him, "he patted me on the shoulder and winked at me. I thought it was

very odd." He turned around, and despite the fact that he could command a wide view of his surroundings, he did not see the Defendant, concluding, "So he – he was gone pretty fast." At that point, he heard his name called from behind the building. The victim was propped against a vehicle, "visibly beaten" and partially undressed. Her pants were unbuttoned and pulled down slightly, her shirt was over her shoulder, exposing her bra, and she was bleeding. The victim was hysterical.

Mr. Bradley Holt, a paramedic, arrived to find the victim unresponsive, with a "pumpknot" on the right side of her face, other abrasions and lacerations on her face, a bruised torso, the onset of bruising in her upper extremities, and blood coming from both nostrils. The victim's shirt was rolled up, her pants were unbuttoned and unzipped but around her waist, and she was not wearing shoes. The victim did not respond to speech, touch, or painful stimulation. She remained unresponsive as she was transported in "emergency status," but toward the end of the trip she was able to mouth her name and curl into a fetal position in response to a question asking if she were in pain. Mr. Holt testified that he would have intubated her but was unable to do so because he did not have the appropriate paralytic medication. He opined that her injuries were inconsistent with a ground-level fall. Ms. Cecilia Miller, who was also a paramedic and was driving the ambulance, agreed that the right side of the victim's face was swollen, scraped, and bloody. The victim was sobbing and could not speak. Ms. Miller confirmed that the victim's shirt was up and that her pants were unbuttoned and unzipped but not pulled down. She would have recommended the use of a helicopter to transport the victim if one had been flying that night. She confirmed that the injuries were inconsistent with a fall. Officer Dan Wilder escorted the victim and the ambulance to the hospital "under emergency traffic," with his sirens and lights on. Officer Terry Bryant located the victim's shoe behind the restaurant.

Ms. Misty Stamm, a sexual assault nurse examiner, identified a diagram she made of the victim's injuries. The victim had multiple abrasions on her face, swelling, redness, injuries on her right knee, left foot, left shoulder, leg, left elbow, coccyx, and left forearm. Ms. Stamm also found two tears on the victim's labia minora with a small amount of active bleeding. She testified that she had "only seen that sort of injury consistent with a sexual assault," "[l]ikely penetration," but she acknowledged that the tears "[p]ossibly" could have resulted from a consensual sexual act. She also stated that although the victim had a catheter, she had never seen a catheter cause labial tears. She testified that the motive behind rape is often control and domination. The victim told Ms. Stamm that she went to a bar, that a man bought her a shot, that she did not leave the drink alone, and that going outside to smoke was the last thing she recalled.

The victim testified that when she woke up in the hospital, she was in a neck brace and her whole body hurt. She testified in particular that she felt interior and exterior

vaginal pain and that she had trouble urinating for two to three days due to the pain. She did not have any pain or injuries prior to the night of January 31, 2014. She also testified that she had previously had a catheter during the birth of her child and that she had suffered no side effects or burning during urination from the catheter.

Detective Kevin Bush testified that the emergency call came in at 11:36 p.m. and he went to the hospital to collect evidence. The victim had a blood alcohol level of .21 at 2:04 a.m. He was unable to speak with the victim, who was intubated, but spoke with her the following day. He agreed that the victim had stated that she did not recall anything after going outside to smoke. Detective Bush also agreed that intoxication can affect coordination and that there was some snow on the ground on the night of the assault, making walking treacherous.

The Defendant was not apprehended on the night of the assault, but Officer Wilder left a request for the bar employees to contact him if they saw the Defendant again. On February 20, 2014, Mr. Parker recognized the Defendant at the bar. Mr. Parker stated that the Defendant appeared to be "looking at me trying to see if I recognized him, so I acted like I didn't." He contacted Officer Wilder, who took the Defendant into custody. Officer Wilder testified that the Defendant told him that he had taken the victim to the restaurant in order to have sexual intercourse and that she fell on the way back.

Detective Bush interviewed the Defendant on February 20, 2014, after the Defendant was advised of his rights in English and Spanish. Detective Bush asked the Defendant if he had been to the bar before, and the Defendant said, "Oh, it's about this girl." The Defendant acknowledged buying the victim a drink and denied putting anything into it. He admitted that he followed her onto the patio, where she intended to smoke. He acknowledged crossing to the restaurant with her and unzipping her pants, but he denied having intercourse with her.

The Defendant gave a DNA sample, and Detective Bush had the sample compared with the physical evidence he had collected from the hospital, including a sexual assault kit and the victim's clothing. No semen was recovered from the evidence. Detective Bush testified that perspiration, urination, washing, and use of a condom can affect the probability of recovering DNA evidence. The victim was able to identify the Defendant from a photographic lineup.

The Defendant presented the testimony of Ms. Tracy Sisto, a licensed registered nurse, to provide an alternate explanation for some of the victim's injuries. Ms. Sisto, who did not testify as an expert and had not practiced nursing since 2001, testified that catheterization can have adverse effects including bladder puncture and irritation. Irritation would cause burning and pain.

The Defendant, testifying through an interpreter, stated that he bought the victim a drink at the bar and that she danced with him, hugged him, and kissed him. The victim went outside to smoke, and he also went outside. The Defendant testified that the victim asked him to have sex three times. They went outside with the intention of having sex. The victim jumped over the three-foot high railing surrounding the patio area, and the two went looking for her car. The Defendant testified that because the victim was confused about the location of her car, they ended up at the restaurant. He left the victim by some crates for a few minutes while he walked a few feet away to look at his telephone.

According to the Defendant, the victim walked toward him, tripped, and fell onto the concrete, hitting her face. He asked if she could walk and she said yes, but when he let her go, she fell on her behind multiple times. She raised her arms, and he picked her up and put her on his shoulder. The Defendant stated he walked toward the group behind the bar to see if they could take her to the hospital and find her friend. Because they appeared angry, he fled. He testified that he was afraid to remain because he was an undocumented immigrant. The Defendant denied hitting or pushing the victim or having intercourse with her. He elaborated that they had intended to have intercourse but that those intentions were derailed when she fell. The Defendant likewise denied unzipping her pants and speculated that her pants were lowered when he carried her. The Defendant stated that accepting a drink "could be" consent to sexual intercourse.

The jury convicted the Defendant of the lesser included offense of aggravated sexual battery. At sentencing, the State argued for the application of numerous enhancement factors and asked for the maximum twelve-year sentence in the range based on the brutality of the attack. The defense noted that the Defendant's prior criminal record consisted only of minor offenses and argued that many of the enhancement factors were elements of the crime. The trial court found that the proof at trial would have been sufficient to uphold a conviction on the charged offense of aggravated rape, noting that the victim's internal injuries showed penetration. The trial court further noted that the attack was brutal, that the victim was barely conscious, and that medical personnel felt her injuries might be life-threatening. The trial court found that the victim was struck, was rendered nearly unconscious, and was dumped on the ground and left. Accordingly, the trial court applied as enhancement that the Defendant had no hesitation about committing a crime in which the risk to human life was high. *See* T.C.A. § 40-35-114(10). The trial court further found that although the Defendant had no prior felonies, he had committed numerous other offenses and had not been a "good citizen" during his tenure in this country. The trial court found that the victim's ability to resist was impaired due to alcohol usage, but the court did not enhance the sentence based on particular vulnerability due to age or physical or mental disability. *See* T.C.A. § 40-35-

114(4); *State v. Buckmeier,* 902 S.W.2d 418, 423-24 (Tenn. Crim. App. 1995) (concluding that enhancement factor (4) was properly applied when the victim was sexually assaulted while intoxicated). It further found that the other three factors argued by the State, that the victim was treated with cruelty, that she suffered particularly great personal injury, and that the crime was committed to gratify the Defendant's desire for pleasure or excitement, were elements of the offense. *See* T.C.A. § 40-35-114(5), (6), (7). The trial court, describing the offense as "egregious," sentenced the Defendant to the maximum within the range of twelve years in prison.

The Defendant moved for a new trial, arguing that the trial court erred in limiting cross-examination, that there was no evidence of sexual contact, and that the sentence was improper. The trial judge was unable to preside, and a successor judge, finding that he was competent to sit as thirteenth juror under *State v. Ellis*, 453 S.W.3d 889, 907-08 (Tenn. 2015), denied the motion. The Defendant appeals, arguing that the jury instructions incorrectly stated the mens rea for the crime and that the trial court erred in enhancing the Defendant's sentence.

## ANALYSIS

### I. Jury Instructions

The Defendant argues that the jury instructions did not clarify that the jury had to find that the Defendant's touching was intentional.[2] The State responds that the issue is waived for failure to raise it in the motion for a new trial.

Under Tennessee Rule of Criminal Procedure 30(b), a party's failure to object to a jury instruction "does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial." However, we agree that the Defendant waived this issue by failing to raise the issue in the motion for a new trial. *See* Tenn. R. App. P. 3(e) ("Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought,

---

[2] The Defendant highlights the prosecutor's closing argument that the attack was in response to the victim's racist remarks and was for the purpose of control and domination rather than sexual gratification, based on Ms. Stamm's testimony. We do not interpret these two sentences in the brief as a challenge to the sufficiency of the evidence, and we note that other evidence, including the Defendant's statements to police and interactions with the victim in the bar, could have supported the jury's conclusion that the Defendant had sexual contact with the victim and that the contact was for the purpose of sexual arousal or gratification.

unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.").

The State further contends that the Defendant is not entitled to plain error relief. For an error to constitute plain error sufficient to merit relief, the following factors must be present: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Additionally, "'the plain error must be of such a great magnitude that it probably changed the outcome'" of the proceeding. *Id.* at 44 (quoting *Adkisson,* 899 S.W.2d at 642). This court need not consider all the factors if it is clear that the defendant will fail to establish at least one. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010). We conclude that the Defendant has not shown that his substantial rights were adversely affected.

A defendant has a right to a correct and complete jury charge. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). This right is constitutional in nature. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). The trial court must present the propositions of law governing the case plainly to the jury, so that the jury is able to comprehend the principles involved. *State v. Williamson*, 919 S.W.2d 69, 80 (Tenn. Crim. App. 1995). A jury charge should contain no statement which is inaccurate, inapplicable, or which might tend to confuse the jury. *State v. Hatcher*, 310 S.W.3d 788, 812 (Tenn. 2010). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014). Jury instructions must be reviewed in their entirety, and no phrase is examined in isolation. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008). A jury instruction which misstates an element of an offense so as to lessen the State's burden of proof amounts to constitutional error. *State v. Page*, 81 S.W.3d 781, 789 (Tenn. Crim. App. 2002). The failure to properly instruct on the mens rea required for an offense is a nonstructural constitutional error which merits reversal unless the State demonstrates the error was harmless beyond a reasonable doubt. *Clark*, 452 S.W.3d at 295.

To convict the Defendant of aggravated sexual battery as charged, the State had to demonstrate that the Defendant had unlawful sexual contact with the victim and caused the victim bodily injury. T.C.A. § 39-13-504(a)(2). Sexual contact "includes the intentional touching of the victim's … intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's … intimate parts, if that intentional

touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6).

The jury instruction on aggravated sexual battery in this case consisted of the following:

> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) That the Defendant had intentional unlawful sexual contact with the alleged victim in which the Defendant intentionally touched the alleged victim's intimate parts or the clothing covering the immediate area of the alleged victim's intimate parts; that the alleged victim had -- or that the alleged victim had intentional unlawful sexual contact with the Defendant in which the victim intentionally touched the Defendant's or any other person's intimate parts or the clothing covering the immediate area of the Defendant's or any other person's intimate parts; and
>
> (2) That the Defendant caused bodily injury to the alleged victim; and
>
> (3) That the Defendant acted intentionally, knowingly or recklessly.
>
> "Sexual contact" means the intentional touching of the alleged victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the alleged victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

The Defendant relies on *State v. Clark* for the proposition that these instructions merit reversal. 452 S.W.3d at 298. In *Clark*, the jury was instructed that it must find unlawful sexual contact in which the defendant "intentionally touched" the victim, but, as in this case, was also instructed that it must find the defendant "acted either intentionally, knowingly or recklessly." *Id.* The Court observed that the act of touching required a finding of an intentional mens rea, while the remaining elements could be satisfied with the lesser mens rea of knowledge or recklessness. *Id.* The Tennessee Supreme Court characterized the accuracy of this instruction, which is similar to the instruction in the

- 11 -

case at bar, as a "close call" and "encourage[d] future courts" to clarify that recklessness would not be sufficient for the mens rea element regarding the act of touching. *Id.* at 298-99. The Court elaborated that the instructions contained an ambiguity because the jury could apply the mens rea of "intentional" to the touching element, or it could conclude that a mens rea of "recklessness" would suffice. *Id.* at 298. The Court noted that the jury "would likely" apply the mens rea of "intentionally" to the element of touching because of the proximity of the two terms. *Id.* However, the Court refused to determine if the instructions were in error because it found any error would be harmless beyond a reasonable doubt. *Id.* at 299. The Supreme Court again pretermitted the issue of whether a similar instruction was in error in *State v. Frausto*, instead ordering that "the jury instructions at the new trial shall conform to this Court's decision in *Clark*." *State v. Frausto*, 463 S.W.3d 469, 487 (Tenn. 2015).[3]

In *State v. Troy Love*, this court determined that it must address whether a similar jury instruction was erroneous. No. E2015-02297-CCA-R3-CD, 2017 WL 1077062, at *22 (Tenn. Crim. App. Mar. 21, 2017), *perm. app. denied* (Tenn. July 20, 2017). This court concluded that based on evidence that the defendant had claimed that he "didn't mean to do it," the instruction would not have been harmless beyond a reasonable doubt. *Id.* at *21. Accordingly, this court addressed the accuracy of the instruction, concluded the instruction was erroneous, and reversed the conviction. *Id.* at *22. This case was decided approximately one year after the Defendant's trial.

The Defendant urges us to rely on *Troy Love* to find that the instruction was erroneous and that the error was not harmless beyond a reasonable doubt. However, the evidence in this case, like the evidence in *Clark*, established that the Defendant's act of touching the victim's intimate parts was intentional. At trial, the Defendant denied any sort of sexual contact with the victim. In his interview with Detective Bush, on the other hand, he acknowledged that he had intentionally unzipped her pants. Thus, there was no evidence from which the jury could have concluded that he had knowingly or recklessly touched the victim. As in *Clark*, any error in instruction would have been harmless beyond a reasonable doubt, and we accordingly conclude that no substantial right of the Defendant was adversely affected. *See Bishop*, 431 S.W.3d at 44.

## II. Sentencing

The Defendant next argues that the trial court erred in enhancing his sentence. He argues that his prior criminal history was "limited" and that the trial court incorrectly

---

[3] The pattern jury instructions have since been amended to incorporate the mens rea into each element of the offense. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 10.03(b) (listing as an element "that the defendant intentionally, knowingly, or recklessly caused bodily injury to the alleged victim").

found that the crime involved a high risk to human life. The State concedes that the trial court erroneously relied on the fact that the offense involved a high risk to human life as enhancement. However, the State argues that the sentence is entitled to a presumption of correctness and there was no abuse of discretion.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. The trial court's weighing of enhancement and mitigating factors is discretionary. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court is "to be guided by — but not bound by — any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.* The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining "the specific sentence and the appropriate combination of sentencing alternatives," the trial court must consider: (1) the evidence at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b).

The trial court found that the Defendant's sentence should be enhanced based on the fact that he "had no hesitation about committing a crime when the risk to human life was high." T.C.A. § 40-35-114(10). As the State notes, enhancement factor (10), requiring a finding that the defendant had no hesitation about committing an offense involving a high risk to human life, "is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim." *State v. Trent*, 533 S.W.3d 282, 294 (Tenn. 2017). Accordingly, as the State concedes, the trial court misapplied this factor. However, the misapplication of enhancement or mitigating factors is no longer a basis for reversal of a trial court's

sentencing decision. *Bise*, 380 S.W.3d at 706. In *Bise*, the trial court misapplied the single enhancement factor supporting the sentence. *Bise*, 380 S.W.3d at 708. The sentence was nevertheless upheld because the trial court had based the decision on its determination of the need for deterrence and the defendant's potential for rehabilitation. *Id.* at 709.

In this case, the trial court noted at sentencing that the evidence was sufficient to support the charged crime of aggravated rape. The court found that the circumstances of the crime of which the Defendant was convicted were "egregious" in that the victim was struck and then sexually assaulted while she was in a semi-conscious state. The trial court also noted that the Defendant had other criminal behavior and that the victim's ability to resist was impaired by alcohol. The court imposed a within-range sentence after considering the purposes and principles of sentencing. Accordingly, we conclude the trial court did not abuse its discretion, and we affirm the sentence.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE